IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| **DALE E. JONES,** | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| V. | ) | Civil No. **05-844-CJP**[1] |
| | ) | |
| **MICHAEL J. ASTRUE,** | ) | |
| **Commissioner of Social Security,** | ) | |
| | ) | |
| Defendant. | ) | |

## ORDER

**PROUD, U.S. Magistrate Judge:**

Dale E. Jones' application for Supplemental Security Income (SSI) pursuant to 42 U.S.C. § 1382 was denied in February 2004 by Administrative Law Judge Anne C. Pritchett. **(R. 22-29).** In October 2005, the Social Security Administration Appeals declined to review ALJ Pritchett's decision, thereby rendering it the final Agency decision. **(R. 7-10).** Jones now seeks review pursuant to 42 U.S.C. § 405(g). **(Doc. 1).** Plaintiff alleges three errors:

1. The total rejection of plaintiff's treating physician's opinions;

2. A failure to assess material vocational evidence regarding the impact of angina; and

3. Reliance upon a residual functional capacity assessment not supported by substantial evidence.

**(Doc. 15).**

---

[1]The parties consented to have a magistrate judge handle all aspects of this case, including entry of judgment; therefore, in accordance with 28 U.S.C. § 636(c), U.S. District Judge Michael J. Reagan referred this action to the undersigned magistrate judge. **(Docs. 5, 12 and 13).**

**Synopsis of the Record**

**The ALJ's Decision**

The alleged onset of disability is August 2, 2001. Two evidentiary hearings were conducted prior to the decision to deny plaintiff SSI– one in February 2003, a second in January 2004. ALJ Pritchett concluded that plaintiff's status post discectomy and fusion at C5-6, coronary artery disease, status post four vessel bypass graft, history of right shoulder decompression and left eye blindness were, individually or in combination, "severe" impairments, as defined by 20 C.F.R. § 416.920(b). **(R. 25 and 28).** Plaintiff's history of depression was not deemed severe, in light of medical records indicating symptoms were only mild. **(R. 25).** None of plaintiff's impairments were found to meet or equal one of the presumptively disabling impairments in 20 C.F.R. Pt. 404, Subpt. P., App. 1, Pt. A. **(R. 25 and 28).**

The ALJ noted that there was no documented re-occlusion of the grafted vessels, no frequent hospitalizations or emergency room visits for angina, plaintiff retained effective use of his upper extremities, and he retained full vision in his right eye. **(R. 25).** ALJ Pritchett found plaintiff not fully credible, and his testimony regarding his limitations exaggerated and inconsistent with other evidence. **(R. 26).** ALJ Pritchett found that the evidence indicated that plaintiff had the residual functional capacity for a limited range of sedentary work.[2] More

---

[2]"Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met." **20 C.F.R. § 416.967(a).**

specifically, plaintiff was limited to lifting and carrying five pounds frequently and 10 pounds occasionally, and sitting and standing/walking six hours out of an eight hour work day; postural limitations were imposed, and overhead work and reaching was precluded.  **(R. 26 and 28-29).** Any work would also have to accommodate plaintiff's monovision and require plaintiff to only rotate his neck 90 degrees in either direction.  **(R. 26 and 29).**  Plaintiff's past work as a carpenter was ruled out, and he was found not to have any transferable skills.  **(R. 27).**

In reaching the aforementioned conclusions, ALJ Pritchett specifically rejected and gave no weight to the opinions of plaintiff's treating physician, Dr. Sloan.  **(R. 26).**  Dr. Sloan concluded in January and December 2003, that plaintiff is physically incapable of work– being able to sit for only 20 minutes, stand for only 15 minutes, and being incapable of lifting and carrying.  **(R. 307-311 and 497-501).**  Dr. Sloan's opinions were found to be inconsistent even with plaintiff's exaggerated testimony.  **(R. 26).**

Based on the aforementioned residual functional capacity, the fact that plaintiff, age 43, is characterized as "younger," his equivalent high school education, Medical-Vocational Rule 201.28 and the testimony of a vocational expert indicating thousands of jobs plaintiff could perform with the aforementioned restrictions, plaintiff was found not disabled.  **(R. 28-29).**

### The Documentary Evidence

As a teen, plaintiff was effectively blinded in his left eye.  **(R. 250 and 541).**

In approximately November 1995, plaintiff was injured at work.  **(R. 176).**  Imaging revealed a mild to moderate acromial impingement of the right rotator cuff, but no tear; and a small, central disc herniation at C5-6.  **(R. 182).**  The range of motion in plaintiff's neck was markedly diminished.  **(R. 176).** By February 1996, plaintiff was released to work, albeit a

3

lighter type of work, as he was limited to lifting no more than 20 pounds.  **(R. 174-175).**  Nevertheless, surgical intervention was suggested.  **(R. 175).**

In October 1996, after a myocardial infarction, a cardiac catheterization revealed two vessel coronary artery disease.  **(R. 184-185).**  In November 1996, post-angioplasty, plaintiff's treating physician, Dr. Sloan, diagnosed plaintiff with angina pectoris and coronary artery disease.  **(R. 297).**  Although it was noted that plaintiff tired easily and was not considered employable at that time, Dr. Sloan opined that plaintiff should not be permanently disabled.  **(R. 297).**

A mental status exam by a psychologist in January 1997 indicates plaintiff's Global Assessment of Functioning ("GAF") score was 55, with his highest score for the year being 57.[3]  **(R. 191).**  Nevertheless, plaintiff was not found to meet the criteria for clinically significant depression or dysthymia.  **(R. 192).**  Plaintiff's score was attributed to the accumulation of all the physical and psychological trauma in his life to date.  **(R. 192).**  A psychiatric review in February 1997 indicates plaintiff had: (1) an affective disorder– a history of mild depression, improved with a low dose antidepressant; (2) a personality disorder, based on a history of antisocial conduct; and (3) substance addictive disorder, due to a history of polysubstance abuse, now in remission.  **(R. 157-158).**  Only a slight degree of limitation was noted, with no episodes of deterioration or decompensation.  **(R. 164).**

---

[3] DSM-IV labels the GAF range of 50-60 as "moderate" symptoms in social or school functioning. ***See*, Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition (DSM-IV), p. 32.** The use of the term moderate by DSM-IV denotes only the range between mild and severe: the text describes the range as involving "serious impairment in social, occupational or school functioning." ***Id.***

In January 2000, plaintiff underwent a discectomy and fusion at C5-6, and a plate was inserted. **(R. 197-198)**. Plaintiff continued to experience neurological symptoms, including numbness in his right arm and right shoulder pain. **(R. 214-215)**. He had spasms, pain at multiple trigger points, his shoulder range of motion was restricted at 50%, cervical flexion was limited to 55 degrees and cervical extension was limited to 35 degrees– all with mild discomfort. **(R. 210 and 213)**. Consequently, in September 2000, plaintiff had arthroscopic surgery on his right shoulder, with subacromial decompression. **(R. 380)**. Six months later, in March 2001, Dr. Goris noted continued difficulty with reaching and overhead motion, causing pain to shoot down plaintiff's arm, and slightly decreased strength. **(R. 460)**. At that time, Dr. Goris thought plaintiff had reached maximum medical improvement, and that plaintiff's range of motion and strength constituted permanent partial disability. **(R. 460)**. Impairment of motion was 10%, with 3% impairment of strength, for a combined total of 13% of the upper extremity, which correlates to 8% impairment of the whole person. **(R. 460)**.

At the time of alleged onset of disability, August 2001, plaintiff described experiencing constant neck pain, for which he took Hydrocodone three times per day with relief lasting anywhere from 30 minutes to three hours. **(R. 132)**. Raising his right arm, and flexing and turning his head, brought on the pain. **(R. 132)**. Dr. Sloan's notes also reflect chronic pain. **(R. 291)**. In October 2001, Dr. Sloan recorded that plaintiff was depressed and experiencing crying episodes, for which Paxil was prescribed. **(R. 289)**. In November 2001, Dr. Sloan expressed concern that plaintiff was taking a lot of pain pills and encouraged him to take fewer Lortab; Elavil was also prescribed. **(R. 288)**.

With respect to plaintiff's cardiac problems, in August 2001 he was diagnosed with unstable angina, but his EKG was normal except for some non-specific wave changes. **(R. 243-244).** A cardiovascular consult in September 2001 further specified that plaintiff had atherosclerotic coronary artery disease and increasing angina. **(R. 249).** During this same time period, a cardiac catheterization indicated a need for another bypass. **(R. 249).** A four vessel bypass was performed. **(R. 252).**

In December 2001, three months post bypass, Dr. Sloan noted that plaintiff reported occasional angina, for which he took nitroglycerin. **(R. 287).** In February 2002, five months post bypass, a stress test was performed, but stopped after 4:45 minutes, due to exertional hypotension with chest tightness and dyspnea. **(R.284).**

In January 2002, after examining plaintiff and reviewing his records, Dr. Leung opined on plaintiff's overall condition. Plaintiff rated his chest pain as eight or nine on a ten scale, and his neck/shoulder/arm pain as five on a ten scale– both helped by pain medication. **(R. 277).** Plaintiff described difficulty with prolonged sitting and standing, but reported he could walk one block. **(R. 278).** However, Dr. Leung observed plaintiff had a normal gait, and was able to heel walk, toe walk, squat, and get on and off the exam table without difficulty. **(R. 278-279).** Decreased range of motion, in both shoulders, the left wrist and neck was noted, but grip strength and fine finger manipulation were intact. **(R. 280).** Plaintiff's neck was mildly tender; lateral flexion was limited to 15 degrees, rotation was limited to 30 degrees, and extension was limited to 60 degrees. **(R. 280).** Plaintiff also reported occasional double vision and difficulty dressing himself. **(R. 277-278).**

In March 2002, Dr. Gotway, an agency physician, offered a residual functional capacity

assessment, with which two other agency physicians concurred.  **(R. 146-153).**   Plaintiff was found capable of lifting and carrying 20 pounds occasionally and 10 pounds frequently, standing and walking six hours out of an eight hour day; and sitting for six hours out of an eight hour work day.  **(R. 147).**  Chest pain was discounted in light of the stress test results.  **(R. 147)**.  Plaintiff was limited to a range of light work due to his heart and back problems.  **(R. 147).**  Plaintiff's lack of vision in his left eye and the impact on peripheral vision precluded jobs requiring a good field of vision.  **(R. 149).**

Although the medical records during 2002, post quadruple bypass, are relatively scant, plaintiff saw Dr. Sloan relatively frequently during 2003.  In January 2003, Dr. Sloan opined that continued pain and numbness in plaintiff's right upper extremity was expected to last a year or longer, as were frequent angina attacks.  **(R. 307).**  Dr. Sloan did not find plaintiff capable of working because he was essentially unable to stand, walk or sit for even one hour at a time; he was posturally restricted, could not reach above shoulder level, could not lift or carry, was unable to drive, could not push, pull or manipulate.  **(R. 309).**  Plaintiff's pain was characterized as moderately severe on a daily basis upon exertion or use, even with medication.  **(R. 310).**  Plaintiff's use of Lortab was noted, and Dr. Sloan specified that there were no side effects.  **(R. 310).**

Dr. Sloan's notes during 2003 reflect that plaintiff's angina was brought on by stress; his heart was stable; he experienced chronic back pain for which Lortab was used.  **(R. 494-496).**  Dr. Sloan advised plaintiff not to take more than three Lortab per day for cervical pain, and nitroglycerin was prescribed for occasional angina pectoris.  **(R. 494).**  In October 2003, Dr. Sloan noted worsening depression, for which Lexapro was prescribed.  **(R. 490).**

In December 2003, Dr. Sloan issued another report, virtually identical to his January 2003 report.  **(R. 497-501;** *see also* **R. 528-529 (ALJ and counsel discuss the similarities)).**

**<u>Plaintiff's Testimony</u>**

Plaintiff Jones, represented by counsel, first appeared before ALJ Pritchett for a hearing on his application on February 4, 2003.  **(R. 532-566).**  At that time, plaintiff was 42 years old and described himself as being 67 inches tall and weighing 179 pounds.  **(R. 537).**  Plaintiff stated that he had a GED, and last worked in 1999 as a carpenter.  **(R. 538).**  Plaintiff is single and lives in a one bedroom trailer.   Plaintiff testified that his right hand continues to go numb when he moves his neck and pinches the nerves.  **(R. 539).**  His shoulder also still hurts and he cannot lift even a coffee pot, without his arm going numb.  **(R. 541).**  Plaintiff was also troubled by occasional stiffness in his hip, where bone was removed for the neck fusion.  **(R. 542).**  Plaintiff reported not driving any more because shifting was difficult with his shoulder and neck trouble.  **(R. 548).**

With respect to his heart, he described experiencing angina twice a day, usually triggered by stress or exertion, and relieved in 20 or 30 minutes by nitroglycerin.  **(R. 543-544).**  According to plaintiff, he can lift no more than three or four pounds, and that triggers angina.  **(R. 544 and 547).**  Even sitting purportedly can precipitate angina.  **(R. 546).**  Plaintiff's stamina is also decreased; he becomes short of breath.  **(R. 545).**  Standing even five minutes was considered difficult; and sitting causes pain in plaintiff's hip, although he estimated he could sit for 35-40 minutes.  **(R. 547 and 552).**   Stairs and inclines were problematic.  **(R. 547).**

Plaintiff also described having to wear sunglasses due to the light sensitivity of his left eye.  **(R. 541).**  He also does not read much due to headaches and blurry vision.  **(R. 549).**

However, plaintiff described spending his time watching television. **(R. 549).**

Plaintiff indicated he does few if any household chores, relying on his girlfriend's assistance. **(R. 549).**

ALJ Pritchett examined plaintiff's hands and discovered a little callousing on the palms, imbedded dirt, a healing cut with a splinter, scabs on the back of plaintiff's hands, and dirt under the fingernails. **(R. 555-556).** Plaintiff explained that all of that was from using his wood stove, shoveling ashes, and puppies and kittens. **(R. 556).**

During a supplemental hearing in January 2004, plaintiff further described his shoulder catching and popping, and his inability to raise his shoulder. **(R. 515).** Lifting so much as a gallon of milk causes pain to shoot down the arm. **(R. 551-516).** Similarly, plaintiff described his neck catching and hurting with movement. **(R. 516-517).** Plaintiff described hardly being able to drive because of his neck problems. **(R. 517).**

Plaintiff also described left wrist pain that keeps him from making a fist, bending it, or holding things. **(R. 518).** He also mentioned that his knee hurts. **(R. 518).** Plaintiff's right hand also goes numb. **(R. 524).**

With regard to his coronary problems, plaintiff described continued chest pain triggered by stress and frustration, and relieved with nitroglycerin. **(R. 520).** Plaintiff estimated he takes nitroglycerin twice daily, but not every day– total about 10 pills per week. **(R. 526).** Walking as little as 25 yards can also cause chest pain, difficulty breathing and headache. **(R. 521).**

Plaintiff takes three Lortab per day, which cause him to be tired. **(R. 523).** The pills relieve shoulder pain, but not neck pain. **(R. 523).** Plaintiff indicated his antidepressant medication also makes him tired. **(R. 523).** Plaintiff lies down during the day. **(R. 523).** He

9

complains that he cannot finish tasks.  **(R. 525).**

### Vocational Testimony

Vocational expert Dr. James Bordieri was presented with multiple hypothetical situations regarding a person of plaintiff's age, education and work history/skills, based on varying residual functional capacities.  **(R. 557-565).**

The first hypothetical assumed a residual functional capacity for light work, further restricted to preclude overhead lifting and reaching, taking into consideration monovision, precluding climbing, permitting only occasional stairs and ramps, and taking into consideration that such a person was taking nitroglycerin, Zocor, Prevacid, Advair, Ativan, aspirin and Hydrocodone.  **(R. 558-559).**  Dr. Bordieri opined that such a person could not perform plaintiff's past work, but could perform light[4], unskilled jobs, such as assembler, hand packer and light unskilled cashier– all available in the regional economy by the thousands.  **(R. 560).**

The second hypothetical further prescribed that such a person could only rotate his or her neck 90 degrees and from side occasionally.  **(R. 560).**  Dr. Bordieri thought the same light unskilled jobs mentioned in the first hypothetical would remain available.  **(R. 561).**

---

[4]"Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time."  **20 C.F.R. § 416.967(b).**

The third hypothetical reduced the residual functional capacity to the sedentary [5] level, and also included the aforementioned limitation regarding rotation of the neck.. **(R. 561).** Dr. Bordieri still concluded jobs were available, such as assembler, cashier and hand packer, all available by the thousands. **(R. 561).**

The fourth hypothetical presumed all of the limitations plaintiff had described. **(R. 561-562).** Under that scenario, Dr. Bordieri opined that no jobs would be available due to the inability to sit, stand, walk and lift things, as well as the fatigue factor. **(R. 562).** The vocational expert agreed that, if the impairments were as indicated, then Dr. Sloan's opinions that plaintiff could not perform any work would be correct. **(R. 562).**

The fifth and final hypothetical added random chest pain more than once per week, requiring 15-20 minutes per episode. **(R. 565).** Dr. Bordieri opined that such a situation probably would not be tolerated at work. **(R. 565).**

## **Applicable Legal Standards**

---

[5] "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time." **20 C.F.R. § 416.967(b).**

"Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met." **20 C.F.R. § 416.967(a).**

To qualify for SSI, a claimant must be "disabled."  "Disabled" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." **42 U.S.C. § 1382c(a)(3)(A).**  A "physical or mental impairment" is an impairment resulting from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." **42 U.S.C. § 1382c(a)(3)(C).**  "Substantial gainful activity" is work activity that involves doing significant physical or mental activities, and that is done for pay or profit.  **20 C.F.R. § 416.972.**

Social Security regulations set forth a sequential five-step inquiry to determine whether a claimant is disabled.  In essence, it must be determined (1) whether the claimant is presently employed; (2) whether the claimant has an impairment or combination of impairments that is severe; (3) whether the impairments meet or equal one of the listed impairments acknowledged to be conclusively disabling; (4) whether the claimant can perform past relevant work; and (5) whether the claimant is capable of performing any work within the economy, given his or her age, education and work experience.  ***See Schroeter v. Sullivan*, 977 F.2d 391, 393 (7th Cir. 1992);** *see also* **20 C.F.R. § 416.920(b-f).**

"The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive. . . ." **42 U.S.C. § 405(g).**  Thus, the Court must determine not whether plaintiff is in fact disabled, but whether ALJ Pritchett's findings were supported by substantial evidence; and, of course, whether any errors of law were made.  ***See Books v. Chater*, 91 F.3d 972, 977-978 (7th Cir. 1996) (citing *Diaz v. Chater*, 55 F.3d 300, 306**

**(7th Cir.1995)).** The Supreme Court has defined substantial evidence as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971).

In reviewing for "substantial evidence" the entire administrative record is taken into consideration, but this Court *does not* reweigh evidence, resolve conflicts, decide questions of credibility, or substitute its own judgment for that of the ALJ. *Brewer v. Chater*, 103 F.3d 1384, 1390 (7th Cir. 1997). Furthermore, an ALJ may not disregard evidence when there is no contradictory evidence. *Sample v. Shalala*, 999 F.2d 1138, 1143 (7th Cir. 1993).

A negative answer at any point in the five step analytical process, other than at the third step, stops the inquiry and leads to a determination that the claimant is not disabled. *Garfield v. Schweiker*, 732 F.2d 605 (7th Cir.1984). If a claimant has satisfied steps one and two, he or she will automatically be found disabled if he or she suffers from a listed impairment (step three). If the claimant does not have a listed impairment but cannot perform his or her past work, the burden shifts to the Commissioner at step four to show that the claimant can perform some other job. *Rhoderick v. Heckler*, 737 F.2d 714, 715 (7th Cir. 1984).

## Analysis

Plaintiff does not make reference to the five-step analytical framework; rather, his focus is on the three alleged points of error.

### Treating Physician's Opinion

Plaintiff takes issue with ALJ Pritchett's total rejection of the January and December 2003 opinions of Dr. Sloan, plaintiff's treating physician. **(R. 307-311 and 497-501)**. Plaintiff argues that the stated reasons for rejection of Dr. Sloan's opinions– that they are unsupported by

13

objective evidence– is inadequate to allow meaningful review.  Plaintiff cites imaging, nerve conduction studies before and after surgery, and the terminated stress test, as evidence supporting Dr. Sloan's opinions that plaintiff is unable to perform work due to his inability to sit, stand, walk, lift, carry, use his hands on a repetitive basis, and because of moderately severe daily pain.  Plaintiff also takes issue with the failure to discuss the poor result of his surgeries.  In addition, plaintiff contends the totality or combined effect of all of plaintiff's ailments was not considered by the ALJ, while that is exactly the basis for Dr. Sloan's opinions.

Usually, a source's opinion is given more weight if there is a treating relationship, but such opinions must be supported by objective medical findings and not be inconsistent with other substantial evidence in the record.  **20 C.F.R. § 416.927(d)(2).**  The "substantial evidence" standard does not require the ALJ to address every piece of evidence in his decision; "he must articulate, at some minimum level, his analysis of the record so that the reviewing court can follow his reasoning."  ***Johansen v. Barnhart*, 314 F.3d 283, 287 (7th Cir. 2002).**  Moreover, an ALJ may not disregard evidence when there is no contradictory evidence.  ***Sample v. Shalala*, 999 F.2d 1138, 1143 (7th Cir. 1993).**

ALJ Pritchett's stated rationale for rejecting Dr. Sloan's opinions is brief, but given the detailed evaluation in the ALJ's order when read as a whole, the ALJ's reasoning is easily followed.  Dr. Sloan's opinions stand in stark contrast to the other medical opinions, and stand in contrast to the other evidence in the record.  Moreover, there is a lack of evidence in the record during the 2002 and 2003 period to support Dr. Sloan's conclusions.

In January 2003, Dr. Sloan opined that continued pain and numbness in plaintiff's right upper extremity was expected to last a year or longer, as were frequent angina attacks.  **(R. 307).**

Dr. Sloan did not find plaintiff capable of working because he was essentially unable to stand, walk or sit for even one hour at a time; he was posturally restricted, could not reach above shoulder level, could not lift or carry, was unable to drive, could not push, pull or manipulate. **(R. 309).** Plaintiff's pain was characterized as moderately severe on a daily basis upon exertion or use, even with medication. **(R. 310).** A virtually identical opinion was issued in December 2003. **(R. 497-501).**

Plaintiff's coronary disease, and cervical and shoulder/arm problems are unquestionable, and all originated prior to the August 2001 onset date. Between August and November 2001, there is evidence of chronic neck pain, for which plaintiff was taking Lortab. **(R. 132 and 291).** In January 2002, Dr. Leung observed that plaintiff's neck pain, although mildly tender and with decreased movement, was aided by pain medication. **(R. 277 and 280).** There was decreased range of motion in the shoulders, left wrist and neck, but grip strength and finger manipulation remained intact. **(R. 280).** In March 2002, three agency physicians concurred that plaintiff retained the residual function capacity corresponding to light work. **(R. 147).**

With respect to his cardiac problems, plaintiff was diagnosed with unstable angina in August 2001, but his EKG was normal. **(R. 243-244).** By fall 2001, a quadruple bypass was necessitated, which does reflect the seriousness of plaintiff's coronary condition. **(R. 252).** With all that said, in December 2001, Dr. Sloan recorded that plaintiff was experiencing only occasional angina, for which nitroglycerin was taken. **(R. 287).** A subsequent stress test in February 2002, was stopped due to exertional hypotension and angina **(R. 284)**, but agency physicians essentially dismissed that relatively abbreviated test in light of the EKG results showing plaintiff completed 7 METS. **(R. 147).** Dr. Sloan even described plaintiff's heart

condition in April 2003 as being stable.  **(R. 494).**

Defendant correctly points out that the findings of reviewing physicians can constitute substantial evidence in support of a decision, and the ALJ is entitled to rely on the conclusions of medical experts.  ***Cass v. Shalala*, 8 F.3d 552, 555 (7th Cir. 1993).**  Given that Dr. Sloan's opinions appear exaggerated in light of the record evidence, and there is a basis for the agency physicians' contrary opinions, the Court does not find that the ALJ erred in totally rejecting Dr. Sloan's opinions.

### **Vocational Evidence Regarding the Impact of Angina**

The fifth and final hypothetical included random chest pain more than once per week, requiring 15-20 minutes per episode.  **(R. 565).**  Dr. Bordieri opined that such a situation probably would not be tolerated at work.  **(R. 565).**  Plaintiff argues that the ALJ failed to assess this evidence and reconcile it with her findings, even though the ALJ recognized plaintiff's ongoing angina.

ALJ Pritchett addressed plaintiff's angina.  She specifically noted that Dr. Sloan had opined that stress and anxiety were a component of the angina attacks, and that in April 2003, Dr. Sloan characterized plaintiff's heart as stable and merely recorded that plaintiff experienced "some" angina.  **(R. 25).**  The ALJ also observed that plaintiff had not required hospitalization or emergency room care for angina.  **(R.25).**  Plaintiff's complaints of chest pain upon exertion– lifting three to four pounds of fire wood– were also included in the evaluation.  **(R. 25-26).**  Although the ALJ found plaintiff's testimony exaggerated, she specifically gave "moderate weight" to the agency physicians' finding that plaintiff was limited by ongoing angina.  **(R. 26).**

Plaintiff ignores the fact that, despite finding plaintiff limited to a degree by ongoing angina, the agency physicians concluded plaintiff was still capable of light work– a fact the ALJ relied upon in her decision. **(R. 26 and 147).** The ALJ's rejection of plaintiff's testimony as exaggerated, and her reliance on Dr. Sloan's April 2003 medical notes, make the vocational expert's testimony on this point off the mark. Therefore, there was no need for further analysis, just as there was no need to analyze the vocational expert's testimony regarding the hypothetical based on plaintiff's testimony about his ailments and their impact.

### Residual Functional Capacity

ALJ Pritchett found that the evidence indicated that plaintiff had the residual functional capacity for a limited range of sedentary work. More specifically, plaintiff was limited to lifting and carrying five pounds frequently and 10 pounds occasionally, and sitting and standing/walking six hours out of an eight hour work day; postural limitations were imposed, and overhead work and reaching were precluded. **(R. 26 and 28-29).** Any work would also have to accommodate plaintiff's monovision and require plaintiff to only rotate his neck 90 degrees in either direction. **(R. 26 and 29).** Plaintiff argues that the residual functional capacity is not supported by substantial evidence. Plaintiff specifically argues that only recognizing the 90 degree limitation of neck rotation ignores the impairments described by Dr. Leung. Plaintiff further objects that the ALJ offered no rationale for ignoring and/or rejecting other documented restrictions to neck movement. Plaintiff also asserts that it was error not to find plaintiff's hand movement was limited, consistent with nerve conduction studies performed in 1996 and 2000. It is important to understand that the loss of fine dexterity would likely preclude sedentary work. *See* **20 C.F.R. § 416.967(b).**

Plaintiff's reliance upon pre-onset medical testing regarding the numbness and pain in plaintiff's wrists and arms ignores post-onset records.  In March 2001, post-shoulder surgery, Dr. Goris noted continued difficulty with reaching and overhead motion, causing pain to shoot down plaintiff's arm, and slightly decreased strength.  **(R. 460).**  At that time, Dr. Goris thought plaintiff had reached maximum medical improvement, and that plaintiff's range of motion and strength constituted permanent partial disability.  **(R. 460).**  Impairment of motion was 10% , with 3% impairment of strength, for a combined total of 13% of the upper extremity.   **(R. 460).**  In January 2002, Dr. Leung noted decreased range of motion in both shoulders, the left wrist and neck, but grip strength and fine finger manipulation were in tact.  **(R. 280).**  The agency physicians opined in March 2002 that plaintiff's gross and fine manipulation were intact, and he had good grip strength.  **(R. 147).**  In contrast, in 2003 Dr. Sloan opined that plaintiff was unable to push, pull or manipulate, rendering him incapable of sustained work activity.  **(R. 309).**

The ALJ found that plaintiff retained effective use of his upper extremities.  **(R. 26).**  The ALJ specifically relied upon Dr. Leung's report, which indicated plaintiff could make a fist and flex his wrist 45 degrees out of 70 degrees, and his fine finger movement and grip strength were intact– all despite an old fracture of the ulnar styloid with 3 mm separation.  **(R. 280 and 283).**  Dr. Leung's notes and the agency physicians' opinion constitute substantial up-to-date evidence of why plaintiff's residual functional capacity is correct.

In January 2002, Dr. Leung found plaintiff's neck was mildly tender; lateral flexion was limited to 15 degrees, rotation was limited to 30 degrees, and extension was limited to 60 degrees.  **(R. 280).**  The residual functional capacity determined by the ALJ only mentioned

18

limited neck rotation to 90 degrees from the midline, although the ALJ also found plaintiff capable of performing postural activities occasionally (except for activities involving climbing ropes, ladders, steps and ramps).  **(R. 26-27).**   Again, the ALJ's reliance on the agency physicians' residual functional capacity assessment supports that ultimate conclusion.  When they determined plaintiff was capable of light work, the agency physicians specifically took into consideration that plaintiff's  lateral flexion was limited to 15 degrees and rotation to 70 degrees. **(R. 147).**  Moreover, the vocational expert's testimony also took into consideration that plaintiff would have to rotate and turn his body and feet (as opposed to only his neck) to accommodate the varying visual fields of, for example, a cashier.  **(R. 560 and 563-564).**   Therefore, remand is unnecessary.

**IT IS THEREFORE ORDERED**, for the aforestated reasons, the final decision denying claimant Dale E. Jones SSI benefits is affirmed in all respects; judgment shall be entered accordingly.

**DATED: March 27, 2007**

<u>s/ Clifford J. Proud</u>
**CLIFFORD J. PROUD**
**U. S. MAGISTRATE JUDGE**